In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-2104

FREDERICK D. JACKSON,

*Plaintiff-Appellant,*

*v.*

CITY OF MADISON, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 22-cv-689 — **James D. Peterson**, *Chief Judge.*

ARGUED DECEMBER 4, 2024 — DECIDED MAY 28, 2026

Before HAMILTON, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* Frederick Jackson appeals the dismissal of his constitutional claims, brought under 42 U.S.C. § 1983, against the City of Madison, Wisconsin and six of its police officers. Officers broke the windows and front door of the home Jackson was occupying and shot him multiple times with non-lethal foam bullets, causing widespread bruising on Jackson's abdomen and left shoulder. The district court

concluded that the undisputed facts showed that officers did not violate clearly established law and were therefore entitled to qualified immunity. We agree with the district court and affirm.

## I.    BACKGROUND

### A. Facts

We review a district court's decision to grant summary judgment de novo. *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020). In so doing, "we must construe the facts in favor of the nonmovant"—here, Jackson—"and may not make credibility determinations or weigh the evidence." *McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A portion of the following statement of facts relies on body camera footage from officers on scene. This evidence was made available to the district court and to us.

The incident in question took place on the night of December 13, 2019, and early morning of December 14, 2019, in Madison, Wisconsin. Jackson was visiting his then-wife, Sherry, whom he was in the process of divorcing. The house was owned by Sherry. Jackson drank heavily during his visit, prompting Sherry to leave the home and take Jackson's keys with her. Around 7:35 p.m., Jackson went to his next-door neighbor's home to ask for a ride, but the neighbor, Tim Mitkos, refused because he had guests over. Jackson left and right afterwards, Mitkos called 911 to report hearing a gunshot, and that he thought it was possible Jackson had fired a gun. However, Mitkos did not actually see a gun being fired and reported that a car had driven by around the same time.

Around 7:40 p.m., Madison (Wisconsin) Police Department Sergeant Javier Loredo (and five other officers not named as defendants) were dispatched to the Jackson home based on Mitkos's report. Loredo and the officers parked down the street. As he got out of his car, Loredo thought he heard gunshots coming from the direction of the Jackson home (though he could not actually see the home). A second officer, Officer Brad Frias, heard a pop from the direction of the Jackson home; he thought it sounded like a gunshot or at least something that warranted more investigation. When he heard the pop, Officer Frias could see the Jackson home: there was a vehicle in the driveway and the garage door was open. A third officer, Officer Max Snyder, also heard what he thought to be a gunshot coming from the Jackson home. A fourth officer at the scene, Officer Justin Cumley, also heard a loud sound, but he thought it sounded more like a hammer hitting an object than a gunshot.

As Loredo and the other officers approached the Jackson driveway from a couple houses away, Loredo saw a man in the driveway but could not identify him. Loredo noticed that the man had something above his head. Next, Loredo observed the man walk towards the garage and heard what sounded like two more gunshots. Both Officer Cumley and Officer Snyder simultaneously heard the noises and interpreted them as gunshots. The officers then observed the man close the garage door and disappear into the house.

After ordering the officers on scene to set up a perimeter, Loredo requested Madison SWAT officers, a crisis negotiator, and an armored rescue vehicle to report to the scene. The armored rescue vehicle, known as a BearCat, arrived around 9:05 p.m. One of the officers on scene interviewed Mitkos,

who repeated what he had told the 911 operator and identified Jackson. The crisis negotiation team, working from a remote command post, conveyed to the officers on the scene that Jackson suffered from alcoholism and had a "weapons history." Based on Mitkos's recounting, the information from the crisis negotiation team, and what the officers had heard and observed, they believed they had probable cause to arrest Jackson for disorderly conduct and recklessly endangering safety.[1] SWAT Officers Jacob Conrad and James Imoehl, two defendants in the case, also responded to the scene.

Nearly six hours later, with on-duty SWAT team members and a BearCat in position around the home, officers tried calling Jackson in hopes of speaking to him, but received no answer. Using loudspeakers in the BearCat, which was parked in the driveway, the officers again instructed Jackson to come out of the home, but again received no response. The announcements were given every few minutes over several hours, and Loredo confirmed they could be heard at the back of the residence. In addition to the announcements, law enforcement activated the BearCat's emergency lights and siren. At some point during this period, a neighbor informed the group that there were several guns in the Jackson home, prompting the officers to treat the incident as a barricaded person incident. This required calling the full SWAT team, which included three additional defendants—Officers Joseph Weberpal, Mitchell Witt, and Rene Gonzalez.

When Jackson still did not respond to the officers' communication attempts after many hours, officers used non-lethal

---

[1] *See* WIS. STAT. §§ 947.01 (disorderly conduct), 941.30 (reckless endangerment).

40 millimeter foam rounds from baton launchers to break the windows at the back of the home. They also used the Bear-Cat's ram to bust down the front door. The goal was to make their announcements more audible to Jackson. Importantly, the decision to break the windows came from officers at the nearby command post, not any of the named defendants.

Around 1:30 a.m., Loredo, Conrad, Witt, Weberpal, and Gonzalez were positioned by the open front door of the Jackson home. A stairway leading up to a second-floor landing was directly in line with the front door. The house was completely dark, with the only source of light being the officers' own equipment. Jackson emerged from a hallway at one end of the landing, where a shelf and other items were visible, wearing nothing but boxer shorts. Officer Conrad instructed Jackson to come down the stairs and outside with his hands up. Jackson began yelling and gesturing at the officers from the top of the stairs, asking them what they were doing at his house and whether he could speak to Officer Howard Payne. Officer Conrad told Jackson that Officer Payne was off duty, to put his hands up, and come down the stairs. Jackson did not comply, instead staying at the top of the stairs, yelling and pointing at the officers, and telling them to get out of his house. Officers could see that Jackson had nothing in his hands. Loredo told the officers to have non-lethal 40 millimeter foam bullets ready, and to move closer to the front door.

Jackson continued yelling and cursing at the officers from the top of the stairs, and Officers Gonzalez and Weberpal each

fired 40 millimeter shots hitting Jackson.[2] After he was shot, Jackson screamed in pain and doubled over. Conrad then instructed Jackson to come down the stairs. Jackson again asked to speak with Payne, and again Conrad told him that Payne was unavailable but that Jackson could speak with him if he came downstairs. Jackson slowly complied, raising his hands and descending the stairs while continuing to curse at the officers.

When Jackson reached the bottom of the stairs, roughly 8 to 10 feet from the front door, he saw an officer stationed outside the kitchen window, stepped toward the kitchen window, gestured at the officer, and repeatedly yelled at the officer to shoot him. Conrad regained Jackson's attention by yelling his name at full volume. Conrad told Jackson to get on his knees and turn away from the officers. Jackson refused and continued yelling. Conrad switched his approach by telling Jackson to turn around and that everything would be explained later. Confusingly, however, Officer Gonzalez repeated Conrad's earlier command for Jackson to get on his knees. Jackson lowered his hands, took two steps to his right, and began to yell at and gesture towards the officers again. Conrad again told Jackson to turn around and that the officers would "explain it all." Jackson did not turn around or get on his knees; instead, body camera footage shows him looking at the wound on his left shoulder. At that moment, Gonzalez shot Jackson with another 40 millimeter foam bullet. Jackson screamed in pain and turned away from the officers, at which

---

[2] Although Jackson disputed how many times he was hit at the top of the stairs, the district court found that Jackson was hit twice—once on the left shoulder and once on the abdomen, and Jackson concedes this finding does not affect the analysis.

point they tackled and arrested him. Jackson was later charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He was ultimately acquitted.

### B. Procedural History

Invoking 42 U.S.C. § 1983, Jackson sued the City of Madison, Sergeant Loredo, and Officers Conrad, Weberpal, Gonzalez, Imoehl and Witt for violating his Fourth and Fourteenth Amendment rights. He raised a litany of claims. Jackson alleged that Loredo had ordered the officers to use baton launchers to break the window of his house. He also alleged that Weberpal and Gonzalez used excessive force when they shot him with 40 millimeter foam rounds, and that Conrad, Witt, Imoehl, and Weberpal used excessive force when they tackled and handcuffed him. He also alleged that the officers failed to intervene to prevent their colleagues' use of excessive force. And he alleged that Loredo and the officers' actions resulted both in physical injury and property damage. Although Jackson did not formally assert a warrantless arrest claim, the district court concluded that such a claim was "awkwardly pleaded" and analyzed it on the merits without resolving whether the defendants had fair notice of the claim. Finally, Jackson also brought a municipal liability claim against the City of Madison under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). Jackson sought both compensatory and punitive damages in connection with his claims.

The district court granted summary judgment to the defendants on all claims. The court concluded that exigent circumstances justified Jackson's warrantless arrest. The court denied Jackson's property damage claim because none of the named defendants had been involved in breaking the

windows and the command had come from officers at a nearby command post and not Loredo. And the court concluded that the officers were entitled to qualified immunity on the excessive force and failure to intervene claims.

On appeal, Jackson drops the *Monell* claim against the City and the excessive force claims related to the arrest itself. He maintains his claim that Weberpal and Gonzalez used excessive force when they shot him with foam rounds, as well as his warrantless arrest claim. He also purports to maintain his property damage and failure to intervene claims.

## II.   DISCUSSION

We review a district court's entry of summary judgment de novo, viewing the facts and all reasonable inferences therefrom in the light most favorable to the non-moving party— here, Jackson. *Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019). However, we do not make credibility determinations or reweigh the evidence. *McCottrell*, 933 F.3d at 655. We discuss Jackson's failure to intervene, property damage, warrantless arrest, and excessive force claims in turn.

### A.  Failure to Intervene and Property Damage Claims

We discuss Jackson's failure to intervene and property damage claims together because Jackson has waived both claims.

A failure to intervene claim, which sounds in the Fourth and Fourteenth Amendments, requires proving that an "officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring."

*Lanigan v. Vill. of East Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997) (emphasis in original) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

Instead of engaging with these elements, Jackson's brief addresses the officers' alleged failure to intervene in a single vague and conclusory sentence: "At the time these actions occurred other officers could have intervened to prevent them, but did not do so." This clipped assertion ignores our repeated admonition that "undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991); *see also, e.g., Moderson v. City of Neenah*, 137 F.4th 611, 616–17 (7th Cir. 2025); *Fields v. City of Chicago*, 981 F.3d 534, 547 (7th Cir. 2020); *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913–14 (7th Cir. 2011). We therefore do not discuss Jackson's failure to intervene claim any further.

Jackson's property damage claim fails for similar reasons. Like failure to intervene claims, claims against state police officers for property damage sound in the Fourth and Fourteenth Amendments. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). Plaintiffs raising such claims must show a causal connection between the property damage and the officers they have sued. *Id*. Jackson's opening brief says the following about property damage:

> Because Loredo was the officer in charge on the scene he is responsible for the damage to the home irrespective of the command center's order to break the windows and door because he had an opportunity to prevent the harm. *Smith v. Rowe*, 761 F.2d 360, 369 (1985) (supervisor

liability under § 1983 when failed to take pre-
ventative action).

Again, we consider "skeletal" arguments like this to be waived. *Hernandez*, 634 F.3d at 913. Jackson asserts that Loredo is liable as a supervisor even though he concedes that Loredo did not give the order to break the windows and door to the home. Yet, despite pointing to *Smith v. Rowe*, Jackson does not even attempt to argue that Loredo "act[ed] or fail[ed] to act with a deliberate or reckless disregard of [Jackson's] constitutional rights," or that the conduct occurred at Loredo's "direction or with [his] knowledge and consent." 761 F.2d 360, 369 (7th Cir. 1985) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). Worse still, Jackson's opening brief ignores the fact that the home did not even belong to Jackson in the first place: it belonged to his then-wife, Sherry. Although Sherry may have a colorable property damage claim, Jackson points to no authority supporting the notion that *he* may sue under § 1983 to recover for damage to property that isn't his. In his reply brief, Jackson attempts to address this flaw by pointing to Wisconsin marital property law, but "arguments raised for the first time in a reply brief are waived," *Darif v. Holder*, 739 F.3d 329, 336 (7th Cir. 2014), and besides, the "niceties of property or marital law" are "far removed from the concerns of the Fourth Amendment," *United States v. Rodriguez*, 888 F.2d 519, 523 (7th Cir. 1989).

Because Jackson has waived his failure to intervene and property damage claims, we reject each.

## B. Warrantless Arrest

Next is Jackson's claim that his warrantless arrest violated the Fourth Amendment. In response, the defendants argue

that the warrantless arrest was constitutional because of exigent circumstances. It is true that exigent circumstances can justify a warrantless entry into a home for the purpose of either arrest or search. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). But exigent circumstances, without more, do not justify the arrest or search. Indeed, exigent circumstances or not, Jackson's arrest still needed to be supported by probable cause to be constitutional. *Jones by Jones v. Webb*, 45 F.3d 178, 181 (7th Cir. 1995). Jackson challenges the presence of probable cause in the first place, so we begin there before turning to exigent circumstances.

### 1. *Probable cause*

"Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013). The inquiry is objective, commonsense, and focuses on what the officer knew at the time. *Id.* We ask how the facts would have appeared to a reasonable person in the officers' shoes, "seeing what he saw, hearing what he heard." *Id.* (quoting *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010)). Probable cause requires more than a hunch, but it does not demand that it was more likely than not that a criminal activity occurred—the officer's belief "need only be reasonable." *Id.*

Jackson was arrested for disorderly conduct and reckless endangerment. *See* WIS. STAT. §§ 947.01 (disorderly conduct), 941.30 (reckless endangerment). We conclude, based on what officers saw and heard on the night in question, there was sufficient probable cause for his arrest. Recall that officers

arrived at the scene after Jackson's neighbor, Mitkos, who had just seen Jackson, called 911 and reported hearing what sounded like gunshots coming from the Jackson residence. Upon arrival, four officers heard loud noises coming from the direction of the Jackson home, and three of them thought the noises sounded like gunshots. Loredo and Cumley both reported seeing a man standing near the garage in Jackson's driveway raise something above his head, at which point they heard additional loud, gunshot-like bangs. Soon after, officers learned from the command post that Jackson suffered from alcoholism and had a "weapons history." It was reasonable for the officers to believe—based on what they heard from Mitkos and the command center, and what they perceived with their own eyes and ears—that Jackson "had committed, was committing, or was about to commit a crime." *Abbott*, 705 F.3d at 714.

Jackson argues that the officers lacked probable cause because they lied about hearing what they thought were gunshots coming from the direction of Jackson's garage. He points out that subsequent investigation revealed no shell casings on the scene, and that he was subsequently acquitted on charges of being a felon in possession of a firearm based on the incident. Thus, according to Jackson, a reasonable jury could conclude that Loredo and Cumley lied about seeing a man in the driveway and lied about hearing loud bangs that sounded like gunshots in their police reports. In Jackson's eyes, the officers' credibility therefore presents a factual question for a jury requiring us to vacate the district court's entry of summary judgment for the defendants.

Jackson's arguments do not persuade us. We have repeatedly explained that the probable cause inquiry focuses "on

what the officer knew *at the time of the arrest.*" *Abbott*, 705 F.3d at 714 (emphasis added). "[W]e do not view probable cause determinations with hindsight." *Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009). Accordingly, "[f]acts later discovered cannot support probable cause; nor can they detract from it." *United States v. Hansmeier*, 867 F.3d 807, 811 n.1 (7th Cir. 2017) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Similarly, "[s]ubsequent evidence of guilt cannot validate the probable cause determination, nor can evidence of innocence invalidate it." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). In line with these principles, neither Jackson's later acquittal nor the results of any subsequent investigations are relevant to the probable cause inquiry—so long as the officers reasonably believed, at the time of arrest, that probable cause existed.[3] *See Sroga v. Weiglen*, 649 F.3d 604, 609–10 (7th Cir. 2011).

Jackson's assertions that the defendant officers were lying when they said they heard gunshot-like sounds coming from Jackson's driveway are similarly unpersuasive. First, this argument is waived because Jackson did not argue to the district court that the responding officers fabricated their police reports. *See Cooper v. Retrieval-Masters Creditors Bureau, Inc.*, 42 F.4th 675, 688 (7th Cir. 2022) (explaining that non-jurisdictional arguments first raised on appeal are deemed waived, even if "the issue may have been before the district

---

[3] Indeed, even if probable cause did *not* exist at the time of arrest, "qualified immunity … protects officers who reasonably but mistakenly believe that probable cause exists." *Abbott*, 705 F.3d at 714–15 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). Thus, only by showing that an arrest was unsupported by even *arguable* probable cause can a plaintiff pierce the "added layer of protection" afforded by qualified immunity. *Id.*

court in more general terms") (quoting *Williams v. Dieball*, 724 F.3d 957, 961 (7th Cir. 2013)). Instead of arguing below that the officers lied about hearing what they thought were gunshots, Jackson argued that the officers could not identify *him* as the person supposedly firing his gun in the driveway, and that, at most, he fired shots into the rafters of his garage. Jackson's theory that the officers lied about even hearing suspicious sounds in the first place is a novel argument made for the first time on appeal and is therefore waived. This waiver principle is especially apt with new factual and evidentiary arguments, for which a reviewing court may benefit from the trial court's analysis of the arguments, in contrast to pure questions of law. *Yee v. City of Escondido*, 503 U.S. 519, 534–35 (1992).

Indeed, even if not waived, Jackson's argument that the officers lied in their reports is negated by Jackson's own factual admissions before the district court. Jackson admitted that Loredo "heard what he believed to be gunshots coming from the area of" the Jackson home, and that "he thought they were coming from" the Jackson house because he knew officers had been dispatched there after reports of gunfire.[4] He also admitted that other officers shared their observations, including that they too thought they heard gunfire, with Loredo.[5] And he further admitted that Frias heard a pop that he "interpreted" as "a gunshot, or, at a minimum, something that warranted further investigation"; that, at the time of the pop, Frias could see that the Jackson home had a vehicle in

---

[4] District Court Dkt. 49, Defs.' Reply to Pl.'s Resp. to Defs.' Statement of Facts, ¶ 20.

[5] Id. ¶ 31.

the driveway and the garage door was open; that Frias later heard a second pop "which he thought sounded like a gunshot" when he stepped away to interview the 911 caller, at which point Frias noticed that the garage door was closed; and that Snyder, who was standing in the front yard, also heard a second gunshot-like sound, which he noticed came from the same area as the first sound.[6]

Stipulations by a party are binding and may not be controverted at trial or on appeal. *Neita v. City of Chicago*, 148 F.4th 916, 927 (7th Cir. 2025). Thus, Jackson "is bound by his admissions" before the district court. *Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 766 (7th Cir. 2008); *Keller v. United* States, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). Those admissions support our conclusion that the officers had probable cause to arrest Jackson.

### 2. *Exigent circumstances*

We turn now to exigent circumstances. Warrantless arrests inside one's home or residence are presumptively unconstitutional unless the police can show exigent circumstances or consent. *Steagald v. United States*, 451 U.S. 204, 211–12 (1981). This is so even "when probable cause is clearly present." *Payton v. New York*, 445 U.S. 573, 589 (1980) (quoting with approval *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978)). As a threshold matter, we note that even though Jackson's wife Sherry owned the home and Jackson may not have been living there permanently, Jackson was still protected by the Fourth Amendment's general prohibition on warrantless arrests in the home absent consent or exigent circumstances

---

[6] Id. ¶¶ 22, 23, 30, 29.

because he was an overnight guest. *Minnesota v. Olson*, 495 U.S. 91, 98–101 (1990) (explaining that overnight houseguests may "claim the protection of the Fourth Amendment" and affirming Minnesota Supreme Court's determination that exigent circumstances did not justify warrantless arrest of overnight houseguest); *United States v. Walker*, 143 F.4th 889, 895–96 (7th Cir. 2025).

Exigent circumstances arise "when there is compelling need for official action and no time to secure a warrant." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). We ask "whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape." *United States v. Diaz*, 814 F.2d 454, 458 (7th Cir. 1987) (quoting *United States v. Acevedo*, 627 F.2d 68, 70 (7th Cir. 1980)). The "police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984).

The exigent circumstances recognized by the Supreme Court are "few in number and carefully delineated." *Id.* at 749 (quoting *United States v. U.S. District Court (Keith)*, 407 U.S. 297, 318 (1972)). They include: ongoing fire, hot pursuit of a fleeing suspect, prevention of imminent destruction of evidence, and the need to render emergency aid to assist persons "who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). An officer's objectively reasonable fear of imminent violence, including self-harm or suicide, may also give rise to exigent circumstances. *Fitzgerald*, 707 F.3d at 731–32. Although the gravity of the underlying offense is a factor in determining exigency, "no

exigency is created simply because there is probable cause to believe that a serious crime has been committed." *Diaz*, 814 F.2d at 459 (quoting *Welsh*, 466 U.S. at 753). All of this adds up to the general rule that courts should not deem a situation "exigent" lightly, and the burden is on the government to make that showing. *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001).

The defendants argue that exigent circumstances justified Jackson's warrantless arrest because the officers on the scene had reasonable basis to believe that Jackson's safety and the safety of others in the vicinity was at risk. They remind us that officers were responding to reports of gunfire and that they saw and heard what they thought was a man discharging a weapon in his garage or driveway before retreating into the residence, where they had been told Jackson had access to more firearms. This, according to the defendants, amounts to an exigency justifying Jackson's warrantless arrest. And even if not, the defendants argue they are protected by qualified immunity.

Jackson offers two counterarguments. First, he maintains that there were no exigent circumstances because the officers were lying about hearing gunshots and seeing a figure in the driveway. As we have already explained, Jackson waived this argument. We will not address it further.

Jackson's second argument is a closer call. He notes that officers had at least 5 hours between their initial arrival on the scene and their eventual arrest of Jackson. This, argues Jackson, was more than enough time to obtain an arrest warrant, so officers cannot rely on exigent circumstances to justify the warrantless arrest. *Fitzgerald*, 707 F.3d at 730 (exigent circumstances arise when there is "compelling need to act and no

time to obtain a warrant) (quoting *Bogan v. City of Chicago*, 644 F.3d 563, 571 (7th Cir. 2011)); *cf. Kentucky v. King*, 563 U.S. 452, 466–67 (2011) ("Faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution."). Indeed, Jackson asserts that the officers did, in fact, obtain a warrant: a premises warrant for the home, but not an arrest warrant for Jackson. Although Jackson does not spell it out, he implies that if officers had time to obtain a premises warrant, they also had time to obtain an arrest warrant.

This argument is likely waived because Jackson did not make this argument in his summary judgment briefing before the district court. *Cooper*, 42 F.4th at 688. More fundamentally, it is undeveloped. Although Jackson references a premises warrant, he does not point to it anywhere in the record, and we could not locate it ourselves. Even if such a warrant existed, Jackson does not explain how he believes it should impact our analysis. *See Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1245 (7th Cir. 1994) ("Once an officer has lawfully entered the premises … the Constitution does not require that he obtain a warrant before [effecting] an otherwise lawful arrest within."). We cannot base our decision on undeveloped arguments that lack evidence and were not presented to the district court.

Setting aside the missing warrant, we can understand Jackson's frustration with the officers' invocation of "exigent circumstances." But even if Jackson is correct that exigent circumstances did not exist and the defendants were constitutionally required to get a warrant, we conclude the

defendants are entitled to qualified immunity for their warrantless arrest in this instance.

Qualified immunity shields police officers from liability for constitutional violations unless a plaintiff shows that (1) the official violated a constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). When satisfying the second prong the right itself "must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "This requires a high 'degree of specificity,'" which is "especially important in the Fourth Amendment context." *Id.* at 63–64 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12, 13 (2015) (per curiam)). That is because it is "sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (quoting *Katz*, 533 U.S. at 205).

"In other words, to clearly establish a right, existing precedent must place the constitutional or statutory question beyond debate." *Sabo v. Erickson*, 128 F.4th 836, 844 (7th Cir. 2025) (en banc) (quotation and citation omitted). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63. "In short, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Sabo*, 128 F.4th at 845 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Heeding these principles, we analyze the officers' qualified immunity defense to Jackson's warrantless arrest claim.

Jackson has not pointed us to binding precedent establishing that exigent circumstances dissipate over the course of a multi-hour standoff during which a suspect believed to be armed fails to respond to police commands, such that a warrantless arrest of said suspect violates the Fourth Amendment. Therefore, we "look to whatever decisional law is available to ascertain whether the law has been clearly established." *McGrath v. Gillis*, 44 F.3d 567, 570 (7th Cir. 1995) (quoting *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1988) (en banc)).

On Jackson's side of the ledger is *Minnesota v. Olson*, 495 U.S. 91 (1990). In that case, a gunman robbed a gas station, murdered the station manager, and then fled in a getaway car. *Id.* at 93. Police captured the gunman and recovered the murder weapon, but the driver escaped. *Id.* When police received a tip that the driver was staying with two women in their apartment, they entered the apartment without seeking permission, found the driver hiding in a closet, and arrested him without a warrant. *Id.* at 93–94. The driver prevailed in a challenge to the constitutionality of his warrantless arrest in the Minnesota Supreme Court, which held that exigent circumstances did not justify the driver's arrest. *Id.* at 94. The Minnesota Supreme Court reasoned that the driver was not thought to be the murderer or armed with the murder weapon; there was "no suggestion of danger" to the two women; the apartment was surrounded by police; and "[i]t was evident the suspect was going nowhere." *Id.* at 100–01 (quoting *State v. Olson*, 436 N.W.2d 92, 97 (Minn. 1989)). The United States Supreme Court affirmed, explaining that it was "not inclined to disagree with [the Minnesota Supreme Court's] fact-specific application" of the exigent circumstances standard. *Id.* at 100.

Like in *Olson*, the Jackson residence was surrounded by officers, so he was unlikely to escape. *See id.* at 101. And Jackson's alleged firing of guns into the air is far less grave of a crime than the underlying murder and robbery in *Olson*. Yet, *Olson* does not place "beyond debate" the question of whether Jackson's warrantless arrest was constitutional. *Chapman*, 847 F.3d at 412. The events in *Olson* took place in the afternoon; Jackson's encounter with the police occurred in the middle of the night. *Olson*, 495 U.S. at 101. There were no facts in *Olson* indicating that the suspected getaway driver was intoxicated or armed. *Id.* at 93–94, 100–01. Jackson was believed to be both, and to have fired a gun earlier that night. Moreover, the Supreme Court in *Olson* was reviewing the decision of a state supreme court and commented that it was "not inclined" to "disturb the state court's judgment" in a "fact-specific application of the proper legal standard," suggesting that deference to the state court's factual analysis was a factor driving the Court's ultimate disposition. *Id.* at 100–01; *see also id.* at 102 (Kennedy, J., concurring) (joining opinion with understanding that it should be read as "deference to a state court's application of the exigent circumstances test to the facts of this case, and not as an endorsement of that particular application"); *id.* at 101–02 (Stevens, J., concurring) (commenting that "[o]nly in the most unusual case should the Court volunteer its opinion that a state court has imposed standards upon its own law enforcement officials that are too high").

Falling on the opposite side of the ledger is a more recent case from the Ninth Circuit. In *Fisher v. City of San Jose*, the Ninth Circuit considered a lawsuit brought by a man, Fisher, who pointed a rifle at a private security guard while intoxicated in his apartment, triggering a more than twelve-hour standoff with police that ended with his peaceful surrender

and warrantless arrest. 558 F.3d 1069, 1070 (9th Cir. 2009) (en banc). Officers invoked the exigent circumstances doctrine to justify their warrantless arrest of Fisher, but Fisher argued that the doctrine did not apply because any exigent circumstances dissipated over time, and the officers had ample opportunity to obtain a warrant. *Id.* at 1075–76. The Ninth Circuit sided with the officers. It held that, "once exigent circumstances justify the warrantless seizure of the suspect in his home, and so long as the police are actively engaged in completing [the suspect's] arrest, police need not obtain an arrest warrant before taking the suspect into full physical custody." *Id.* at 1071.

The facts here fall somewhere between *Olson* and *Fisher*. Like in *Fisher*, the officers entered Jackson's home to arrest him after a multiple hour standoff. *See id.* Unlike in *Fisher*, however, Jackson did not point a gun at a police officer or threaten to shoot anyone. Still, a reasonable officer may have believed Jackson to be more of a threat than the suspect in *Olson*. Unlike the suspect in *Olson*, Jackson was intoxicated, thought to be armed, and believed to have fired a gun earlier that night. But we need not decide today whether the defendants violated Jackson's constitutional rights because, even if the officers acted unconstitutionally by arresting Jackson without a warrant, the illegality of their actions "does not follow immediately" from existing case law. *See Wesby*, 583 U.S. at 64 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *al-Kidd*, 563 U.S. at 735 (explaining that courts may grant qualified immunity based on lack of clearly established law without deciding the underlying constitutional question). Our own survey of the law leads us to conclude that the right to be free from warrantless arrest in the context of a prolonged police standoff during which officers reasonably believed the

suspect to be armed and dangerous was not clearly established at the time of Jackson's arrest in December 2019.

We therefore affirm the district court's grant of summary judgment for the defendants on the warrantless arrest claim.

### C.  Excessive Force

We turn to excessive force. "We analyze excessive force claims under the Fourth Amendment's 'reasonableness' standard." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016). An officer's use of force is unconstitutional if, considering the totality of the circumstances, "the officer used greater force than was reasonably necessary to make the arrest." *Id.* (quoting *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003)). The reasonableness inquiry turns on the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Miller v. Gonzalez*, 761 F.3d 822, 828–29 (7th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Critically, courts assess reasonableness from the perspective of the officer on the scene, factoring in "the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; 'and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances.'" *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (quoting *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018)); *see also Graham*, 490 U.S. at 396–97. If the material facts are undisputed and the court draws the appropriate inferences in favor of the non-moving party, then reasonableness is a question of law for the court. *Siler*, 957 F.3d at 759.

Jackson argues that Weberpal and Gonzalez used excessive force when they shot him three times with 40 millimeter foam bullets, twice at the top of stairs, and once more at the bottom of the stairs.[7] The district court concluded that the officers were entitled to qualified immunity for all three shots.

We reiterate that to defeat qualified immunity, a plaintiff must point us to law that is established clearly enough "that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63. In an excessive force case, a plaintiff can show clearly established law by identifying a "closely analogous case that established a right to be free from the type of force the police officers used on him." *Cibulka v. City of Madison*, 992 F.3d 633, 639 (7th Cir. 2021) (quoting *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015)). Although the case need not be precisely on point, it must be a case "where an officer acting under similar circumstances … was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 13). As such, the Supreme Court has emphasized the need for "[p]recedent involving similar facts." *Id.* at 105.

---

[7] Jackson also states in a conclusory fashion that officers used excessive force in handcuffing him. Because Jackson does not develop this argument, we consider it waived and do not address it further. *Berkowitz*, 927 F.2d at 1384.

Alternatively, a plaintiff may defeat qualified immunity by arguing that, even without an analogous case, the use of force "was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Cibulka*, 992 F.3d at 639 (quoting *Weinmann*, 787 F.3d at 450). But this argument succeeds only in "rare" instances.[8] *Wesby*, 583 U.S. at 64.

Jackson argues against qualified immunity both by offering analogous case law and by maintaining in the alternative that Gonzalez's and Weberpal's use of force was "so plainly excessive that [they] knew that it was unconstitutional." The latter argument is waived because Jackson failed to raise it before the district court. *Cooper*, 42 F.4th at 688; *Jackson v. City of Madison*, No. 22-cv-689, 2024 WL 2803326, at *7 (W.D. Wis. May 31, 2024) ("Jackson does not argue that the force used in this case was so plainly excessive that the defendants knew that it was unconstitutional."). Therefore, Jackson's only path to success is to put forward a closely analogous case clearly establishing that the use of 40 millimeter foam rounds by Gonzalez and Weberpal "was unlawful in the situation [they] confronted." *Katz*, 533 U.S. at 202.

Jackson points to several cases that, according to him, clearly establish the unconstitutionality of the officers' use of force at the top of the stairs. Many of them are non-starters. *Strand v. Minchuk* involved an officer's use of deadly force against a truck driver, who, after physically fighting with the

---

[8] For example, we held that it was plainly unconstitutional, even absent factually analogous case law, for an officer to force a "handcuffed, passive suspect into a squad car by breaking his ribs." *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995).

officer over parking tickets, stepped back and twice said "I surrender." 910 F.3d 909, 911–12 (7th Cir. 2018). *Ellis v. Wynalda* involved the use of deadly force against a fleeing burglar. 999 F.2d 243, 245 (7th Cir. 1993). Neither case is analogous enough to ours to satisfy the "clearly established law" requirement. Not only are their contexts materially different, but each also involves the use of deadly force. As Jackson points out, we have acknowledged that non-lethal rounds fall on "the high-end of the spectrum of less-lethal force" and that non-lethal force "is not to be deployed lightly." *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 522 (7th Cir. 2012) (citation omitted). But even so, courts distinguish between lethal and non-lethal force when seeking out clearly established law regarding the use of non-lethal force. *See Omdahl v. Lindholm*, 170 F.3d 730, 733–34 (7th Cir. 1999) (remanding for jury to resolve whether bean bag rounds counted as "deadly force or merely a higher level of force along a ladder of escalating force," a question that would determine whether the defendant-officers were entitled to qualified immunity); *Phillips*, 678 F.3d at 529–30 (analyzing qualified immunity question in case involving non-lethal bullets by looking to case law involving non-lethal force); *Mercado v. City of Orlando*, 407 F.3d 1152, 1158–61 (11th Cir. 2005) (same).

*Estate of Escobedo v. Bender*, a non-lethal force case, also does not help Jackson. 600 F.3d 770 (7th Cir. 2010). In that case, we denied qualified immunity to officers who, in attempting to extricate a suicidal man from his home, used "twelve times the incapacitating amount of tear gas," blindly launched a flash bang grenade into the home (which caused a fire after interacting with the tear gas), detonated another flash bang grenade mere feet from the suicidal man, and eventually shot

him as he was setting down his gun. *Id*. at 777, 783. After surveying cases involving the use of tear gas and pepper spray on non-prisoners from our Circuit and others, we held that the officers were not entitled to qualified immunity for their excessive use of tear gas and flash bang grenades because, among other things, the suicidal man was alone, had not threatened anyone else, had not committed a crime, was not holding hostages, and was not causing a large disturbance. *Id.* at 783–84. By contrast, the officers here had probable cause to believe Jackson was armed and had fired a weapon into the air hours earlier. Moreover, the use of force in *Escobedo*, which involved extreme amounts of tear gas and flash bang grenades detonated at close range, is too different from the projectiles officers fired at Jackson for *Escobedo* to supply the clearly established law in this case. *Escobedo* itself demonstrates this by relying on cases involving tear gas and pepper spray instead of non-lethal bullets. *Id.*

Jackson's arguments gain traction with *Phillips v. Community Insurance Corp.*, 678 F.3d 513 (7th Cir. 2012). In *Phillips*, we held that police officers were not entitled to qualified immunity when they fired four non-lethal bullets at a non-responsive, highly intoxicated driver in a stationary car who "presented no immediate threat" and "made no attempt to flee or even avoid police fire." 678 F.3d at 517–18, 529. The driver, Phillips, was driving while severely intoxicated, backed her car into a hedge, dangled both feet out of her car, and smoked a cigarette in her car as officers yelled at her to get out. *Id.* at 517–18. Even though she was so intoxicated she could barely move, officers shot her four times in the legs with non-lethal bullets; she ended up with thirty stitches and walked with a cane for three weeks. *Id.* In assessing whether the officers were entitled to qualified immunity, we asked

whether "it was clearly established … that multiple trauma-inducing shots would constitute excessive force when used to secure a non-resisting, intoxicated arrestee." *Id.* at 528. We answered "yes," concluding that the officers were not entitled to qualified immunity because they "should have known that it was unlawful to … use such a significant level of force on a nonresisting or passively resisting individual." *Id.* at 529 (citing *Rambo*, 68 F.3d at 207 (no qualified immunity when officer physically injured suspect who was verbally resisting arrest); and *St. John v. Hickey*, 411 F.3d 762, 772–75 (6th Cir. 2005) (same)).

Jackson argues that he, too, was either complying or, at most, passively noncompliant, so the defendants should be denied qualified immunity under *Phillips*. Viewing the facts in Jackson's favor, as we must, we see some similarities between the facts here and *Phillips*. Like Phillips, Jackson did not threaten any of the officers, and although he was "verbally resisting" by cursing at the officers, he was not violent or assaultive. In fact, after being shot twice, he complied with commands to come down the stairs.

Ultimately, however, we see too many material differences between *Phillips* and the facts here for *Phillips* to constitute clearly established law as applied to the undisputed facts here. As the defendants point out, critical to our reasoning in *Phillips* was the fact that "any threat [Phillips] presented had already been substantially contained" by the time the officers decided to shoot her. *Phillips*, 678 F.3d at 525. That is not the case here. Officers had probable cause to believe that Jackson had access to multiple firearms and that he had fired a gun earlier that night. From the upstairs landing, Jackson could have retreated into a side room or grabbed a weapon

potentially on the shelf near the railing. By contrast, to even start her car and become a threat to the officers in *Phillips*, Phillips, who was lying down, "would have had to, at a minimum, sit up, bring her feet in, close the car door, and press the gas pedal." *Id.* at 525. Looking to the facts of this case, *Phillips* is not analogous enough to satisfy the "clearly established law" requirement. *Id.* at 528–29. So, the officers are entitled to qualified immunity for their use of force at the top of the stairs.

We acknowledge that when Jackson came downstairs in boxer shorts and with nothing in his hands, he posed less of a threat to the officers. But, when he got downstairs, Jackson continued to act belligerently, taking several steps toward an officer posted outside his kitchen, repeatedly gesturing and cursing at the officers, and refusing commands. After an officer told Jackson to turn around and that they would "explain it all," Jackson stopped moving momentarily before lifting his arm to, presumably, inspect his wound. At that point, an officer shot Jackson. In light of these facts, a reasonable jury could find that Jackson was complying with the officers' commands in the moment he was shot.

Even so, as noted above, the facts of *Phillips* are too distinguishable to constitute clearly established law. Far from being "sprawled across the front seat" of a vehicle 40 to 50 feet away like the suspect in *Phillips*, Jackson was 8 to 10 feet away, upright, and, for much of the time he was downstairs, engaging angrily with the officers. *See id.* at 518, 525. Whereas Phillips was so intoxicated that she barely reacted to being hit with non-lethal projectiles, *id.* at 518, Jackson walked downstairs and took several steps towards an officer even after being hit twice. With these significant factual differences in mind, we

simply cannot conclude that *Phillips* clearly establishes that the defendants' use of force here was unconstitutional.

Finally, we acknowledge that Jackson points to *Miller v. Gonzalez*, in which we stated that the "law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest" and that this "prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." 761 F.3d 822, 829 (7th Cir. 2014). But the applicability of this important and clearly established principle "depends critically on the fact that the suspect is indeed subdued." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009); *see also Shirley v. Rabensteine*, No. 22-2147, 2023 WL 129432, at *2 (7th Cir. Jan. 9, 2023). It also depends on whether Jackson was passively resisting in the first place. The use of non-lethal force "against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable." *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) (collecting cases). One example of active resistance is "declining to follow instructions while acting in a belligerent manner," as opposed to being "docile and cooperative." *Id.* (citations omitted). Reviewing the body camera footage and the undisputed facts in the light most favorable to Jackson, an officer certainly could have reasonably, but mistakenly, concluded that force was justified because Jackson was "declining to follow instructions while acting in a belligerent manner.[9] Even if we accept Jackson's contention that he was

_____

[9] Jackson presents these issues as jury questions, but absent disputed material facts, reasonableness is a question of law for the court. *Siler*, 957 F.3d

only passively resisting at the bottom of the stairs, the circumstances surrounding the final shot were "at most on the hazy border between excessive and acceptable force," requiring an analog in case law to defeat qualified immunity for the officers. *Pam v. City of Evansville*, 154 F.4th 523, 532 (7th Cir. 2025).

We do not mean to explain away the officers' actions. We mean only to emphasize that case law does not establish "beyond debate" that the officers' use of force on Jackson was unreasonable. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). We emphasize that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Sabo*, 128 F.4th at 845 (quoting *Briggs*, 475 U.S. at 341). Even viewing the facts in Jackson's favor, we cannot say that the choices to shoot Jackson with 40 millimeter foam rounds were the decisions that only "plainly incompetent" officers would make. Thus, we agree with the district court that the officers are entitled to qualified immunity on Jackson's excessive force claim.

### III.    CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the defendants.

---

at 759. Because the video is conclusive and unambiguous as to Jackson's non-compliant behavior, we can rely on it for firmly settling this fact issue. *Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021). As we have instructed, a "factual account is not to be credited if it is 'blatantly contradicted' by the video evidence." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

JACKSON-AKIWUMI, *Circuit Judge*, concurring in the judgment. Frederick Jackson will not be able to present his claims to a jury because he has not identified a prior case that would have advised the officers that their actions were unconstitutional. The Supreme Court's recent decision in *Zorn v. Linton*, 146 S. Ct. 926, 929 (2026), cements this as the correct result as a matter of law. Therefore, I concur in the judgment but note that this case highlights the tension between qualified immunity—specifically, its "clearly established" prong—and the Constitution.[1]

## I.

Our role is to determine whether a trial should be held on Jackson's Fourth Amendment challenge to (1) the officers' warrantless, unauthorized entry into his home to arrest him five hours after he allegedly fired a gun, and (2) their use of non-lethal force when he became still and silent after being angry and belligerent. As the majority opinion concludes, the answer is no. The reason is because Jackson has not identified a case recognizing the rights he seeks to vindicate under the same circumstances. *Id.* at 930–31. As I explain below, however, given the unique facts of Jackson's case and the law governing his claims, it is not clear that such a case exists.

Consider first Jackson's warrantless arrest claim. The officers interpreted Jackson's lack of engagement with them as a threat that warranted SWAT tactical team intervention and justified their entry into his home. But nothing in the record suggests that Jackson engaged in any threatening behavior in the five hours after the officers heard the shots, or that Jackson

---

[1] Because I agree that Jackson waived the remainder of his claims, I focus only on his warrantless arrest and excessive force claims.

even had reason to believe that the officers suspected him of a crime. When the officers first saw Jackson in his driveway, they did not alert him to their presence, give him any commands, tell him that he was suspected of firing a gun, or otherwise attempt to interact with him. Later, officers did attempt to contact Jackson multiple times from outside his home without success, but they do not claim that any of their communications informed him why they were present.

From Jackson's point of view, his only offenses were upsetting his wife with his drunkenness, asking a neighbor for a favor, and ignoring the officers. That separates Jackson from the suspects in other exigent circumstances cases who either engaged with police, were in the process of committing a crime, or at least were aware that they had committed a crime and given a reason for police contact. *Minnesota v. Olson*, 495 U.S. 91, 93–94 (1990); *Fisher v. City of San Jose*, 558 F.3d 1069, 1071 (9th Cir. 2009).

It is therefore no wonder that Jackson did not respond positively to the officers breaking his windows or opening his front door to get his attention. But responding angrily to law enforcement's unwelcome intrusion into one's home is not a crime. *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987) ("The Constitution does not allow such speech to be made a crime. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); *Payton v. New York*, 445 U.S. 573, 585 (1980) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (citation omitted)). Moreover, citizens are not required to adhere to police directives inside their homes without

knowledge of the reason for the command. *Payton*, 445 U.S. at 590 ("The Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").

These facts and principles are also relevant to Jackson's excessive force claim. Drawing all inferences in Jackson's favor as we must, his angry response cannot be the basis for a finding that he was resisting an arrest that he had no idea was to occur. The same holds true for Jackson's initial failure to comply with officers' demands to come downstairs. Nevertheless, the officers cite Jackson's behavior and his potential proximity to guns to defend their uses of force. Even if Jackson's temperament and location account for the two shots fired while Jackson was upstairs, they cannot justify the third shot.

The officers' body cameras captured the scene: we can hear a barking K-9 dog and several officers giving Jackson conflicting instructions right before the third shot. In addition, the videos confirm that Jackson (1) was downstairs in only his boxers, (2) had nothing in his hands, and (3) had taken two side steps in the opposite direction of the officer who shot him the third time. Jackson had also stopped yelling and cursing at that point. Instead, he was still, silent, and inspecting his wound. The evidence therefore does not show that Jackson was threatening the officers or resisting arrest as required to justify the third shot.

To summarize, from Jackson's perspective, he was subjected to an unwelcome police intrusion on a drunken Friday evening, never informed of the reason for the intrusion, and shot three times while inside his wife's home in his underwear. In context, some might consider Jackson's conduct—

anger at the intrusion without information, stillness in the face of contradicting instructions, and attention to his wound after being shot—reasonable under the circumstances.

But the reasonableness of Jackson's behavior is of no moment for our qualified immunity review. Officers are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (citation omitted). Even though the constitutional right against warrantless arrests and excessive force belongs to Jackson, the first step of the qualified immunity analysis hinges on the reasonableness of the officers' actions. *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) ("Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts." (citation omitted)). As such, Jackson is essentially excluded from consideration except to the extent his actions impact the reasonableness of the officers' actions. *Pam v. City of Evansville*, 154 F.4th 523, 533 (7th Cir. 2025) ("[W]e rest our analysis on the facts viewed from the vantage point of reasonable officers on the scene.").

Furthermore, at the second step of the qualified immunity analysis, we can only deem the officers' actions unreasonable if Jackson identifies precedent recognizing that he was protected from the officers' unconstitutional conduct under nearly identical circumstances. *Zorn*, 146 S. Ct. at 931. Jackson cannot meet that burden.

Jackson cannot meet that burden with his warrantless arrest claim, even though the Supreme Court's definition of exigent and its decisions about the exception implicitly rule out most situations involving multi-hour delays. *See Lange v.*

*California*, 594 U.S. 295, 302 (2021) (explaining that exigent circumstances present a "now or never situation." (citation omitted)); *id*. at 301 (summarizing cases, all of them involving "a compelling need for official action and no time to secure a warrant" (citation omitted)). Nor can Jackson meet that burden with his excessive force claim, even though we have said, albeit under slightly distinguishable facts, that "multiple trauma inducing shots would constitute excessive force when used to secure a non-resisting, intoxicated arrestee." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 528 (7th Cir. 2012).

Stated simply, Jackson was unlikely to discover any cases involving a multi-hour delay without communication from a contained suspect, where a court later concluded that there had been a need for immediate action and no time to secure a warrant. *Lange*, 594 U.S. at 301. And though Jackson did discover a case announcing a rule that would cover his excessive force claim, that case is apparently too factually dissimilar. Jackson thus finds himself at an impasse.

## II.

Jackson's dilemma demonstrates the well-documented tension between constitutional rights and qualified immunity. *See generally Green v. Thomas*, 734 F. Supp. 3d 532, 558–60 (S.D. Miss. 2024) (Reeves, J.), *aff'd in part, rev'd in part*, 129 F.4th 877 (5th Cir. 2025) (collecting cases and articles in which "[j]ustices, judges, advocates, and scholars have long found fault with qualified immunity"). The Fourth Amendment seeks to protect Jackson's rights. U.S. CONST. amend. IV. Its "basic purpose" is to "safeguard the privacy and security of *individuals* against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (emphasis added) (citation omitted).

But the second step of the qualified immunity analysis disregards the individual and instead considers only the officer's presumed knowledge. That reality is difficult to reconcile with the Founders' vision of a government in service of its citizens. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ("Governments are instituted among Men, deriving their just powers from the consent of the governed."); THE FEDERALIST NO. 78 at 467 ("[T]he Constitution ought to be preferred to the statute, the intention of the people to the intention of their agents."). That reality is also difficult to reconcile with the history and purpose of 42 U.S.C. § 1983, the vehicle by which legions of plaintiffs like Jackson seek to remedy violations of their constitutional rights. "The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

Equally important, qualified immunity ignores the reality that courts interpret laws by deciding concrete disputes. *Camreta v. Greene*, 563 U.S. 692, 701 (2011) ("Article III of the Constitution grants this Court authority to adjudicate legal disputes only in the context of 'Cases' or 'Controversies.'"). Thus, in cases involving constitutional questions, courts do not create constitutional rights but instead recognize the rights the Constitution has guaranteed since its inception. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Yet qualified immunity conditions officers' liability for constitutional violations on the existence of nearly identical precedent. *Zorn*, 146 S. Ct. at 931. It shifts focus away from even the reasonableness of officers'

actions to the degree of similarity between a case's facts and prior facts courts have seen. *Id*.; *Ziglar*, 582 U.S. at 151.

That means officers will not be held accountable for constitutional violations in cases like Jackson's that present novel fact patterns, even if the right has been recognized more generally. In effect, qualified immunity removes protection from citizens for rights guaranteed under the Constitution unless those rights are implicated in all but the most often repeated circumstances.

There is a corollary threat. When, as here, courts faced with a qualified immunity defense choose to resolve the case at the second step of the analysis based on the unavailability of similar precedent, they decline to address newer or less common ways officials violate constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Under this regime, some constitutional rights may never be defined. *Id*. (recognizing that defining constitutional rights "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise"). This practice of constitutional avoidance in the context of qualified immunity "threatens to leave standards of official conduct permanently in limbo." *Camreta*, 563 U.S. at 705–06 ("Courts fail to clarify uncertain questions, fail to address novel claims, [and] fail to give guidance to officials about how to comply with legal requirements.").

A final challenge worth highlighting is that qualified immunity assumes ignorance on the part of officers, without much justification. The doctrine functions on the premise that officers are oblivious to constitutional rights unless a case warns them that their precise actions in a precise set of circumstances would violate the Constitution. *Zorn*, 146 S. Ct. at

930–31. That assumption ignores that reasonable people—on whom the qualified immunity standard is based—are expected to conform to societal norms without guidance about their specific actions, and they are often punished for falling short. *Cheek v. United States*, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system."); *White v. Pauly*, 580 U.S. 73, 78–79 (2017) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (citation modified)). It is ironic that citizens can lose their freedom by unknowingly violating the law, but officers cannot be subjected to a jury determination about whether they violated the Constitution.

Assuming officer ignorance, as qualified immunity does, also fails to account for the reality that officers *are* trained on broad constitutional principles, not granular factual scenarios. *See* Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. CHI. L. REV. 605, 610 (2021). Given that reality, claims for constitutional violations should not be foreclosed by marginal factual differences among cases unknown to officers.

This view was once supported by caselaw. Indeed, until its most recent decision in *Zorn*, the Supreme Court had consistently reminded us that "an officer might lose qualified immunity even if there is no reported case directly on point" because it "is not necessary, of course, that the very action in question has previously been held unlawful." *Ziglar*, 582 U.S. at 151 (citation omitted). We were also told that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S.

730, 741 (2002). But, with *Zorn*, that is no longer the rule. Rather, qualified immunity, which I am bound to respect under the doctrine of stare decisis, now gives law enforcement a free pass to violate a constitutional right—even one that seems apparent—if the right has not yet been adjudicated in precisely the same circumstances.

For years, critics have warned of the dangers qualified immunity presents. *See, e.g.*, *Kisela v. Hughes*, 584 U.S. 100, 121 (2018) (Sotomayor, J., dissenting) (noting the doctrine has transformed into "an absolute shield for law enforcement officers"); *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., respecting the denial of certiorari) (urging the Court to reconsider the doctrine because, among other problems, "the one-size-fits-all doctrine is also an odd fit for many cases because the same test applies to officers who exercise a wide range of responsibilities and functions"); William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45, 82, 87 (2018) ("[N]early all of the Supreme Court's qualified immunity cases come out the same way—by finding immunity for the officials."); *id.* at 84 ("[L]ower courts that follow Supreme Court doctrine should get the message: think twice before allowing a government official to be sued for unconstitutional conduct").

Now the day has come when the doctrine's privilege has nearly eclipsed the Constitution's guarantees. Our decision in this case illustrates as much. I am compelled to rule that it was not "clearly established" that officers could not enter Jackson's home based on the exigent circumstances exception even though the officers had over five hours of dormancy to get a warrant. I am also compelled to rule that it was "not beyond debate" that officers could not shoot Jackson with a

third non-lethal bullet when he was standing still and silent. A jury cannot use its sound judgment to determine whether the officers' actions were reasonable, when in all other areas of tort law we have faith that juries can ably sort out liability. *See Green*, 734 F. Supp. 3d at 566–68. By virtue of the qualified immunity doctrine, constitutional torts are the lone exception. Nevertheless, because *Zorn* forecloses any other result, I concur in the judgment.